112 So.2d 96 (1958)
237 La. 660
UNION OIL & GAS CORPORATION OF LOUISIANA
v.
Wallace J. BROUSSARD et al.
No. 43149.
Supreme Court of Louisiana.
January 6, 1958.
On Rehearing November 10, 1958.
On Second Rehearing April 27, 1959.
Rehearings Denied June 1, 1959.
*97 Herschel N. Knight, Jennings, Cobb & Wright, Morris Wright, New Orleans, for appellants Hawthorne, Inc., Harry E. Hawthorne, Harry R. Hawthorne and Hugh A. Hawthorne.
Plauche & Stockwell, Oliver P. Stockwell, Lake Charles, Saal & Saal, Gueydan, for appellant Wallace J. Broussard.
Walter G. Arnette, Lestage & Arnette, Jennings, for defendant-appellee J. Woodrow Waggoner.
Liskow & Lewis, Lake Charles, for appellee.
Edwards & Edwards, S. W. Plauche, Jr., Lake Charles, for Charlie M. Watkins and Claude C. Watkins, amicus curiae.
MOISE, Justice.
Plaintiff, the owner of two oil, gas, and mineral leases insofar as they affect the North Half (N ½) of Section 33, Township 10 South, Range 4 West, of lands situated in Jefferson Davis Parish, instituted this concursus proceeding, praying that the court pass upon conflicting claims as to the ownership of a 1/24th royalty interest on the oil and gas produced from a well on the property, completed by it on or about January 11, 1955. It deposited $5,532.51 in the registry of the court, alleging that this represented the value of the 1/24th royalty interest in dispute among the named defendants from the date of first production until April 20, 1955.
The facts of record show that on January 19, 1943, Niblett Farms, Inc., the then owner of the land upon which the well herein involved was later drilled, conveyed a 1/24th mineral royalty interest to five named parties. On May 11, 1948, the land itself was sold by Niblett Farms, Inc. to Wallace J. Broussard, and the sale included the following provisions:
"(a) There is excepted from this conveyance oil, gas and other mineral royalties and royalty rights heretofore reserved and sold to others and hereby especially reserved to the vendor in the total of 3/32nds of all of the oil, gas and other minerals produced or to be produced and saved from the land; provided, however, that the foregoing 3/32nds royalty interest includes as a part thereof a royalty interest of 1/24th of the oil and gas on and under said land and to be produced therefrom, being the same 1/24th interest heretofore sold to Mrs. Sarah L. Martin, David C. Ritchie, Mrs. Gladys C. Burchenal, Charles A. McCoy and Mrs. Gertie Halloway, by deed dated January 19, 1943, and recorded * * the rights of Grantor under this additional reservation being subject to the prior sale so made, but including all reversionary rights of Grantor as the present owner of said land, it being the intention that if and when the 1/24th royalty rights so sold should terminate, the reversion thereof shall be for the benefit of Grantor herein whose rights to such additional amount of royalties shall immediately become effective.
"(b) Vendor herein reserves for itself and its successors and assigns a mineral right interest in the said land, together with all necessary rights of ingress and egress thereon, equal to one-half (½) of the oil, gas and other minerals therein and thereunder, but subject to the limitations and conditions hereinafter stipulated.
"(c) Two-thirds (2/3) of the amount of outstanding royalties hereinabove excepted from this conveyance, or a total of 2/32nds of all of the oil, gas and other minerals produced from said land *98 shall be chargeable against and payable out of the mineral right interest herein reserved to any by vendor; the remaining 1/32nd royalty interest being chargeable to and deducted from the rights of the vendee in the land herein described.
"(d) No lease shall be granted unless 1 such lease provides for sufficient royalties payable out of the oil, gas and other minerals produced from the land to pay all royalties outstanding on the date of this deed and which are to be charged against the respective rights of the parties as set forth in paragraph (c) hereof, and so as to pay vendee herein, or his successors and assigns, a minimum royalty of 1/32nd of all the oil, gas and other minerals produced and saved from the property. Should any lease to be negotiated in the future provide for total royalties in excess of the usual 1/8 then the amount of royalties in excess thereof shall then be divided between and belong to vendor and vendee, or their respective successors or assigns, in equal proportions."
On September 22, 1948, Niblett Farms, Inc., sold to Harry E. Hawthorne all of the oil, gas, and other minerals and mineral rights affecting the land. Hawthorne, Inc., successor of Niblett Farms, Inc., then sold to Harry E. Hawthorne all of the reversionary rights averred to be owned by it. Between the date of that sale and December 8, 1952, Harry E. Hawthorne, Harry R. Hawthorne, and Hugh A. Hawthorne sold, resold, and donated, among themselves, royalty interests and mineral rights affecting their averred interests.
By act dated December 8, 1952 (superseded by an act of January 16, 1953), Harry E. Hawthorne and Hawthorne, Inc., attempted to reactivate those portions of the 1/24th royalty interest sold to David C. Ritchie and Mrs. Gladys R. Burchenal. Each of the parties owned a 1/144th interest, the sum total being a 1/72nd interest. Mr. Ritchie and Mrs. Burchenal conveyed their interests to J. Woodrow Waggoner, who in turn conveyed ½ of his interest to Hugh A. Hawthorne. Only the 1/72nd interest was averred to be alive at the time of trial.
As hereinabove stated, a producing well was completed on this property in January, 1955. Wallace J. Broussard maintained that the 1/24th royalty interest conveyed on January 19, 1943, prescribed on January 19, 1953, and that as owner of the land he became entitled to this 1/24th of production of oil and gas. He contended that there could be no reversionary royalty rights as set out in the act of sale to him. The Hawthorne interests and J. Woodrow Waggoner claimed that this 1/24th royalty interest was vested in them.
The matter went to trial on the facts as presented above. The final opinion of the trial court, after rehearing, held that in Louisiana there could be no reversionary interests as set forth in Paragraph (a) of the contract of sale, supra, but, that the 1/72nd interest, supra, was interrupted by the act of reactivation. In his reasons for judgment, the trial judge concluded:
"Premises considered we find that except as to the one/seventy-second (1/72) which Harry E. Hawthorne interrupted and which is charged against his mineral interest, the one-twenty-fourth (1/24) royalty which is the subject of this dispute passed out of the picture. When the royalty passed out of the picture, since one/third (1/3) of the one/twenty-fourth (1/24) royalty was apportioned as having been taken from Mr. Broussard's one/half (½) minerals, Mr. Broussard is now entitled to one/third (1/3) of the outstanding one/twenty-fourth (1/24) which amounts to a royalty of one/seventy-second (1/72). Harry E. Hawthorne is entitled to nine/sixteenths (9/16) of two-thirds (2/3) of the one/twenty-fourth (1/24) royalty less the one/seventy-second (1/72) which he interrupted; i. e. a royalty of one/fiveseventy-sixths (1/576). Hugh A. Hawthorne *99 is entitled to five/sixteenths (5/16) of two/thirds (2/3) of one/twenty-fourth (1/24) plus the one/one-forty-fourth (1/144) which he purchased from Mr. Waggoner; i. e. a royalty of nine/five-seventy-sixths (9/576). Harry R. Hawthorne is entitled to two/sixteenths (2/16) of two-thirds (2/3) of the one/twenty-fourth (1/24); i. e. a royalty of one/two eighty-eighths (1/288). J. Woodrow Waggoner is entitled to a one/one-forty-fourth (1/144)."
The above was reduced to judgment, from which all parties have appealed, except the Union Oil and Gas Corporation of Louisiana and J. Woodrow Waggoner.
It is the contention of Hawthorne, Inc., Harry E. Hawthorne, Harry R. Hawthorne and Hugh A. Hawthorne, joined in brief by J. Woodrow Waggoner, that the trial court erred in adjudging an undivided one-third (1/3rd) interest in the royalty in dispute to Wallace J. Broussard. They argue that even if the language of the contract of sale mentioning reversionary rights must be disregarded, the language sufficiently sets forth that the 1/24th royalty interest must inure to their benefit.
Wallace A. Broussard maintains that as owner of the land he is entitled to the 1/24th royalty interest.
The deed of January 19, 1943, was the sale of a 1/24th royalty interest; but, unless there was production upon the land involved, the interest expired in ten years, or, on January 19, 1953. In Continental Oil Co. v. Landry, 215 La. 518, 41 So.2d 73, 75, this Court ably stated:
"In Vincent et al. v. Bullock et al., 192 La. 1, 187 So. 35, this court held that the reservation of a royalty right to the oil, gas, and other minerals in a tract of land imposes upon the property a real obligation and is a species of real right running with the land, subject to the prescription of 10 years liberandi causa.
"It is also well settled that this right is merely one to share in the production of oil, gas, and other minerals if and when they are produced from the property subject to the right. It is passive in its nature, and there is no obligation on the royalty owner to develop the property, nor does he have this right. All that he acquires is a right attached to the land, the right to receive his share of the minerals if and when they are produced. St. Martin Land Co., v. Pinckney et al., 212 La. 605, 33 So.2d 169; Union Sulphur Co., Inc., v. Lognion et al., 212 La. 632, 33 So.2d 178; Humble Oil & Refining Co. v. Guillory et al., 212 La. 646, 33 So.2d 182. His share of the minerals when they are produced is royalty. At the moment of the execution of the royalty sale, under our holding in Vincent et al. v. Bullock et al., supra, a species of real right is created, imposing a burden upon the land, which is subject to the prescription of 10 years liberandi causa." (Italics ours.)
We again said, in the case of Arkansas Fuel Oil Co. v. Sanders, 224 La. 448, 69 So.2d 745, 746:
"When the royalty right prescribed it passed out of the picture. There was nothing to revert to anyone. The parties are in the same position as though no royalty right had ever existed. It was merely a conditional obligation depending on an uncertain event which prescribed in ten years because the event did not occur. * * *"
The record discloses that no production was received from the land involved until plaintiff brought in a producing well in 1955. Therefore, the 1/24th royalty interest sold by Niblett Farms, Inc. in various denominations on January 19, 1943, prescribed on January 19, 1953. What Niblett Farms, Inc., sold was merely the right to share in the production of oil, gas and other minerals if and when they were produced within ten years. The royalty owners *100 entered into a conditional obligation, and when the condition did not occur, prescription liberandi causa became applicable to this 1/24th royalty interest. LSA-C.C. 789.
The acts of reactivation of December 8, 1952 and January 16, 1953, were attempts by the Hawthorne interests to reactivate part of the 1/24th royalty interest. These deeds were not signed by the landowner, Wallace J. Broussard, and the record does not disclose any instrument signifying his intent to interrupt the running of prescription. To have the running of prescription interrupted, there would have had to be an acknowledgment on the part of the landowner, and none exists. We, therefore, conclude that the deeds of reactivation could have no effect on the running of prescription on the sale of the 1/24th royalty interest. Liberty Farms, Inc. v. Miller, 216 La. 1023, 45 So.2d 610.
In the deed of sale of the land to Wallace J. Broussard, supra, it is stated that the 1/24th royalty interest shall revert to the grantor at its termination. The insertion of such a provision was an attempt, by those who did not at that time own the royalty interest, to take such interest out of commerce. Such action is definitely against the public policy of the State of Louisiana, and our ruling in the case of Hicks v. Clark, 225 La. 133, 72 So.2d 322, 325, condemning a reversionary interest in minerals, is applicable to a reversionary interest in royalty rights. We hold that the following statement from that decision is apposite to the present controversy:
"We consider the reservation of the reversionary interest in this case as an effort to circumvent the public policy of this state, and we therefore refuse to recognize or give effect to it. * *"
There is no merit to the Hawthorne group's contention that, even if we omitted the reversionary language from the contract the 1/24th royalty interest would now belong to them. It follows, that when the 1/24th royalty interest prescribed in its entirety on January 19, 1953, any funds which might become attributable to such interest belong to the landowner. The reason for this is found in the very language of the contract, supra, between Niblett Farms, Inc. and Wallace J. Broussard which reads:
"* * * provided, however, that the foregoing 3/32nds royalty interest includes as a part thereof a royalty interest of 1/24th of the oil and gas on and under said land and to be produced therefrom, * * *". (Italics ours.)
A reading of the act of sale from Niblett Farms, Inc., to Wallace J. Broussard convinces us that it was the clear intent of the parties to retain to the vendor ½ of the minerals but 3/32nds of the royalties. It is, likewise, clear that the vendor intended that the 1/24th royalty interest, which is the basis of this suit, form a part of the 3/32nds royalty interest reserved. Therefore, when the 3/24th royalty interest prescribed, it had to be subtracted from the 3/32nds royalty interest. This would leave a royalty interest of 5/96ths to the vendor and 7/96ths to the landowner.
In his answer to plaintiff's petition, Wallace J. Broussard prayed for attorney's fees. Since this demand was neither briefed nor urged in this Court, we presume that it has been abandoned.
Amicus Curiae has filed a brief on behalf of Charlie M. Watkins and Claude C. Watkins in support of the position of Wallace J. Broussard, and we have drawn the following chronological list of conclusions similar to those presented by him:
(a) The public policy of the State of Louisiana is against any reservation of reversionary rights in mineral servitudes, and this policy applies fully to any such attempt to deal with mineral royalty rights. Therefore, the efforts by Niblett Farms, Inc., to reserve the reversionary rights in the outstanding royalty created by it as landowner, and which reservation was sought to be made by Niblett Farms, Inc., as owner of the land, is in law a violation of the public *101 policy of this State; particularly is this true when there is an attempt to prolong, by contract or conventional arrangements, the normal life of a mineral servitude, and it is only by the happening of the event of production that such will be permitted.
(b) At the expiration of the 1/24th royalty interest by the running of the liberative prescription, the benefit of that prescription accrued to the landowner, Wallace J. Broussard, who was not only the landowner but also the owner of ½ of the minerals.
For the reasons assigned, the judgment of the trial court is reversed and set aside.
It is now ordered that the landowner, Wallace J. Broussard, be and he is hereby declared to be the owner of the 1/24th royalty interest herein involved; it is further ordered that the Clerk of Court turn over to him the $5,532.51 deposited in the registry of the court, which amount represents the value of said interest.
It is further ordered that Union Oil and Gas Corporation of Louisiana, holder of mineral leases on the lands involved herein, subject to the mineral royalty interests involved in this concursus, be and it is hereby relieved of all liability for the payment of the money deposited in this concursus and for all costs of these proceedings.
All costs are to be assessed in accordance with the provisions of Act 123 of 1922, as amended, LSA-R.S. 13:4816.
HAMITER, J., concurs in the decree.
HAWTHORNE, J., is of the opinion a rehearing should be granted.

On Rehearing
SIMON, Justice.
The Union Oil & Gas Corporation of Louisiana as the assignee of two mineral leases insofar as they affect the North Half (N½) of Section 23, Township 10 South, Range 4 West of lands in Jefferson Davis Parish, impleaded the conflicting claimants as to the ownership of a 1/24th royalty interest in the oil and gas produced by it under said leases. It deposited $ 5,531.15, realized from the sale of the oil and gas produced, in the registry of the court, representing the value of the 1/24th royalty interest here in dispute among the named defendants from the date of first production, January 11, 1955, until April 20, 1955.
In January, 1943, Niblett Farms, Inc., the then owner of the land upon which production was later obtained, sold a 1/24th mineral royalty interest to five named parties, including David C. Ritchie and Mrs. Gladys R. Burchenal. On May 11, 1948, Niblett Farms, Inc., sold the land to Wallace J. Broussard, subject to the following provisions among others:
"(a) There is excepted from this conveyance oil, gas and other mineral royalities and royalty rights heretofore reserved and sold to others and hereby especially reserved to the vendor in the total of 3/32nds of all of the oil, gas and other minerals produced or to be produced and saved from the land; provided, however that the foregoing 3/32nds royalty interest includes as a part thereof a royalty interest of 1/24th of the oil and gas on and under said land and to be produced therefrom, being the same 1/24th interest heretofore sold to Mrs. Sarah L. Martin, David C. Ritchie, Mrs. Gladys C. Burchenal, Charles A. McCoy and Mrs. Gertie Halloway, by deed dated January 19, 1943, and recorded * * * the rights of Grantor under this additional reservation being subject to the prior sale so made, but including all reversionary rights of Grantor as the present owner of said land, it being the intention that if and when the 1/24th royalty rights so sold should terminate, the reversion thereof shall be for the benefit of Grantor herein whose rights to such additional amount of royalties shall immediately become effective.

*102 "(b) Vendor herein reserves for itself and its successors and assigns a mineral right interest in the said land, together with all necessary rights of ingress and egress thereon, equal to one-half ½ of the oil, gas and other minerals therein and thereunder, but subject to the limitations and conditions hereinafter stipulated.
"(c) Two-thirds (2/3) of the amount of outstanding royalties hereinabove excepted from this conveyance, or a total of 2/32nds of all of the oil, gas and other minerals produced from said land shall be chargeable against and payable out of the mineral right interest herein reserved to any by vendor; the remaining 1/32nd royalty interest being chargeable to and deducted from the rights of the vendee in the land herein described.
"(d) No lease shall be granted unless such lease provides for sufficient royalties payable out of the oil, gas and other minerals produced from the land to pay all royalties outstanding on the date of this deed and which are to be charged against the respective rights of the parties as set forth in paragraph (c) hereof, and so as to pay vendee herein, or his successors and assigns, a minimum royalty of 1/32nd of all the oil, gas and other minerals produced and saved from the property. Should any lease to be negotiated in the future provide for total royalties in excess of the usual 1/8th, then the amount of royalties in excess thereof shall then be divided between and belong to vendor and vendee, or their respective successors or assigns, in equal proportions."
On September 22, 1948, Niblett Farms, Inc., sold to Harry E. Hawthorne all of the oil, gas, and other minerals and mineral rights affecting the land. Hawthorne, Inc., successor of Niblett Farms, Inc., then sold to Harry E. Hawthorne all of the reversionary rights averred to be owned by it. Between the date of that sale and December 8, 1952, Harry E. Hawthorne, Harry R. Hawthorne, and Hugh A. Hawthorne sold, resold, and donated, among themselves, royalty interests and mineral rights affecting their averred interests.
By act dated December 8, 1952 (superseded by an act of January 16, 1953), Harry E. Hawthorne and Hawthorne, Inc., attempted to reactivate those portions of the 1/24th royalty interest sold to David C. Ritchie and Mrs. Gladys R. Burchenal. Each of the parties owned a 1/144th interest, the sum total being a 1/72nd interest. Mr. Ritchie and Mrs. Burchenal conveyed their interests to J. Woodrow Waggoner, who in turn conveyed ½ of his interest to Hugh A. Hawthorne. Only the 1/72nd interest was averred to be alive at the time of trial.
There was no production from the land affected by the 1/24th mineral royalty interest within the ten-year period commencing January 19, 1943, the date of the royalty interest conveyance. On January 11, 1955, a producing well was completed on the land, thus provoking this proceeding to have the ownership of the production attributable to the 1/24th mineral royalty interest determined.
As hereinabove stated, a producing well was completed on this property in January, 1955. Wallace J. Broussard maintained that the 1/24th royalty interest conveyed on January 19, 1943 prescribed on January 19, 1953, and that as owner of the land he became entitled to this 1/24th of production of oil and gas. He contended that there could be no reversionary royalty rights as set out in the act of sale to him. The Hawthorne interests and J. Woodrow Waggoner claimed that this 1/24th royalty interest was vested in them.
In the final opinion, after rehearing, the trial court held that there could be no enforceable reversionary interests as declared upon in paragraph (a) of the contract of sale, supra, but that the 1/144th mineral royalty interest, owned by Ritchie and Burchenal, but thereafter acquired by Waggoner and Hugh A. Hawthorne in equal shares, *103 was interrupted by the act of reactivation of December 8, 1952 (superseded by an act of January 16, 1953), supra. In his reasons for judgment the trial judge concluded:
"Premises considered we find that except as to the one/seventy-second (1/72) which Harry E. Hawthorne interrupted and which is charged against his mineral interest, the one-twenty-fourth (1/24) royalty which is the subject of this dispute passed out of the picture. When the royalty passed out of the picture, since one/third (1/3) of the one/ twenty-fourth (1/24) royalty was apportioned as having been taken from Mr. Broussard's one/half (½) minerals, Mr. Broussard is now entitled to one/third (1/3) of the outstanding one/twenty-fourth (1/24) which amounts to a royalty of one/seventy-second (1/72). Harry E. Hawthorne is entitled to nine/sixteenths (9/16) of two-thirds (2/3) of the one/twenty-fourth (1/24) royalty less the one/seventy-second (1/72) which he interrupted; i. e., a royalty of one/five-seventy-sixths (1/576). Hugh A. Hawthorne is entitled to five/ sixteenths (5/16) of two/thirds (2/3) of one/twenty-fourth (1/144) plus the one/ one-forty-fourth (1/144) which he purchased from Mr. Waggoner; i. e., a royalty of nine/five-seventy-sixths (9/576). Harry R. Hawthorne is entitled to two/sixteenths (2/16) of two-thirds (2/3) of the one/twenty-fourth (1/24); i. e. a royalty of one/two eighty-eights (1/288). J. Woodrow Waggoner is entitled to a one/one-forty-fourth (1/144)."
From this judgment all parties appealed, except Union Oil and Gas Corporation of Louisiana and J. Woodrow Waggoner.
It was contended by Hawthorne, Inc., Harry E. Hawthorne, Harry R. Hawthorne and Hugh A. Hawthorne, joined in brief by J. Woodrow Waggoner, that the trial judge was in error in adjudging an undivided one-third (1/3) interest in the 1/24th mineral royalty to Wallace J. Broussard. They urged that even if the provisions of the contract of sale as to reversionary rights, paragraph (a), must be disregarded, said contract sufficiently sets forth that the 1/24th mineral royalty interest, under our law, must inure to their benefit.
On the other hand, Wallace J. Broussard maintained that, as owner of the land, he is entitled to the entire 1/24th mineral royalty interest.
The primary question to be resolved, and which for purposes of clarity may be restated, is whether the termination of the 1/24th royalty interest, extinguished as a result of the failure of production within the prescriptive period of ten years, sold by Niblett Farms, Inc. on January 19, 1943, and imposed by it as real obligation attached to the ½ mineral interest reserved by it in the sale of the land to Wallace J. Broussard on May 11, 1948, resulted in a benefit to the owners of the reserved ½ mineral interest or to the fee owner of the land.
Throughout our jurisprudence, in adjudicating upon basic mineral rights, in resolving problems arising from the oil industry, then unknown to framers of our Civil Code, we have consistently and wisely followed and applied such of our codal articles as were most judiciously applicable to the nature of the rights asserted. We are justified in our pursuit of that course for the Legislature, during many years has, with rare exceptions, abstained from adopting statutes to guide us in determining the many involved controversies so frequently arising in this industry. The policy of applying the articles of our Civil Code, wherever applicable in resolving questions involving mineral rights, has been repeatedly adhered to by us.
One of the fundamental principles recognized in all jurisdictions is that of the freedom of contract. Our Civil Code pronounces that "perfect ownership gives the right to use, to enjoy and to dispose of one's property in the most unlimited manner * * *". LSA-C.C. art. 491. In the sense of the words "unlimited manner", neither *104 the letter nor spirit of the law forbids an owner from making a variety of dispositions as affecting his ownership. Hence, one may dismember the ownership of his property and dispose of each separate dismemberment as he pleases, from which flows the basic principle that all things not forbidden by law may legally become the subject of contracts and that the intention of the parties should be controlling. LSA-C.C. arts. 1764, 1945, 1953.
The declaration of codal Article 491, supra, is necessarily qualified thusly: "* * provided it is not used in any way prohibited by law or ordinances." There exists fundamental principles further qualifying this article, supra, in that whatever be the disposition it must contain nothing contrary to public order, public policy or good morals.
In Queensborough Land Co. v. Cazeaux, 136 La. 724, 67 So. 641, 644, L.R.A.1916B, 1201, we said:
"The declaration of article 491 that the owner may dispose of his property `in the most unlimited manner' is qualified by the addition, `provided it is not used in any way prohibited by laws or ordinances'; and, as a matter of course, it is further qualified by the fundamental principles that the disposition must have in it nothing contrary to public order or public policy or good morals. But, in the absence of any objection of that kind, nothing will be found in the letter or in the spirit of our law to prevent an owner from making what disposition he pleases of his property."
We further approved this principle in the case of Mt .Forest Fur Farms of America, Inc., v. Cockrell, 79 La. 795, 155 So. 228, 229, observing:
"* * * aside from the landowner's exploring his own land for minerals he has only two possible sources of income or profit in dealing with his land: (1) The cash consideration or bonus which he may receive for the lease, and payments made for renewals of the lease; and (2) the royalty.
"There is no reason why, in disposing of his land, the landowner may not reserve to himself both of these sources, nor is there any reason why he should not reserve but one of them, or a percentage of one or of both."
We must also take full cognizance that obligations which are attached to immovable property are called real obligations. LSC.C. art. 2010. One of the methods in which these real obligations may be created is by the alienation of immovable property, subject to a condition, either expressed or implied by law. LSA-C.C. art. 2012. In their creation they are "susceptible of all the modifications that the will of the parties can suggest, except such as are forbidden by law." LSA-C.C. art. 2013.
In the landmark case of Vincent v. Bullock, 192 La. 1, 187 So. 35, 40, wherein, for the first time, we defined the nature of a mineral royalty interest, a decision which has guided us and those dealing in mineral royalties and which has established a rule of property, we said:
"`Perfect ownership gives the right to use * * * and to dispose of one's property in the most unlimited manner * * *' (Revised Civil Code, Art. 491), and nothing will be found in either the letter or the spirit of our law to prevent an owner from dismembering his property and from disposing of each separate dismemberment as he pleases."
Manifestly, the sale of the 1/24th royalty interest by Niblett Farms, Inc., to the five named purchasers, supra, on January 19, 1943, created in favor of the vendees, not a servitude, but a species of real right, a real and conditional obligation depending on an uncertain event, subject to the prescription of ten years liberandi causa, if the event, the production of minerals, did not occur within that period of time. The mineral royalty, thus conveyed, as distinguished *105 from a mineral servitude, was only a right, a real obligation, attached to the ownership of the land, and formed no part of the thing itself. St. Martin Land Co. v. Pinckney, 212 La. 605, 33 So.2d 169; Humble Oil & Refining Company v. Guillory, 212 La. 646, 33 So.2d 182; LSA-C.C. Art. 2010.
It is to be observed that after the sale of this royalty interest, Niblett Farms, Inc., continued to own the land and all of the minerals, subject only to the obligation to account to the royalty purchaser for a 1/24th of all minerals produced from the land if production occurred within the period of ten years from the date of the royalty sale. It is equally true, that, as the owner of the land and all the minerals, it had the perfect right to dismember its ownership and dispose of each separate dismemberment as it pleased, but just so long as it did not prejudice the acquired rights of its royalty vendees, or that it make any disposition contrary to law, public policy or good morals. The right of freedom of contract was duly exercised by it on May 11, 1948, when it sold the land to Wallace J. Broussard, and therein reserved to itself a ½ mineral, interest, a 3/32nds royalty interest and included a stipulation which provided in what proportions the real obligation created by the reservation of the royalty interest should be charged against the mineral rights reserved by Niblett Farms, Inc., and that of the mineral rights acquired by Broussard with his purchase of the land.
It must be conceded that immediately prior to the sale to Broussard, the entire mineral interest as well as the land was owned by Niblett Farms. Inc., and the entirety of this mineral interest was charged with a real obligation flowing in favor of the owners of the 1/24th royalty interest, and to account to such royalty owners for 1/24th of any minerals that might be produced from the land within the 10year prescriptive period. In selling the land to Broussard, the minerals were thus dismembered, reserving ½ for itself and conveying the other ½ with all of the land to Broussard. It follows that a mineral servitude was thus created in favor of Niblett Farms, Inc., under which it had the privilege of going upon the property for the purpose of exploring for the minerals and reducing them to possession if successful, but subject to the obligation to account to Broussard, the landowner for his ½ share of the production. Suffice it to say the landowner enjoyed the same privilege subject to the same obligation to the other ½ mineral owner. Clark v. Tensas Delta Land Co., 172 La. 913, 136 So. 1. It is equally true that whoever produced the minerals was also under the obligation to account to the owners of the royalty interest for their pro-rata share of the production, if production occurred within the ten-year prescriptive period. Vincent v. Bullock, supra; Union Sulphur Co. v. Lognion, 212 La. 632, 33 So.2d 178; Humble Oil and Refining Co. v. Guillory, supra; Union Sulphur Co. v. Andrau, 217 La. 662, 47 So.2d 38.
Niblett Farms, Inc. and Broussard could have agreed that the reserved royalty interest would be a charge solely against the mineral interest acquired by Broussard with his acquisition of the land, or they could have agreed that the reserved royalty interest would be a charge solely against the mineral servitude retained by Niblett Farms, Inc. Instead of agreeing on either of these alternatives, they agreed that 2/3rds of the reserved royalty interest, or a 2/32nds royalty interest, would be a charge against Niblett's mineral servitude and that 1/3rd of the reserved royalty interest, or a 1/32nd royalty interest, would be a charge against Broussard's mineral rights and that the 1/24th royalty interest previously sold should be included in the royalty interest chargeable against Niblett's mineral servitude. This agreement is embodied in paragraphs (a), (b) and (c) of the conveyance of May 11, 1948, by Niblett Farms, Inc., to Wallace J. Broussard set forth hereinabove.
It is well recognized that the mineral servitude reserved to Niblett Farms, Inc., *106 in its sale of the land to Broussard is classified as incorporeal immovable property and it has been referred to as "the most valuable property in the state." DeMoss v. Sample, 143 La. 243, 78 So. 482, 484; Ford v. Williams, 189 La. 229, 179 So. 298. And it is equally well settled that a real obligation may be created, such as the mineral servitude reserved, by imposing conditions on the alienation of real property, and when so created "is susceptible of all the modifications that the will of the parties can suggest, except such as are forbidden by law." LSA-C.C. Arts. 2012, 2013, 1764, 2010.
Hence, it follows that when Niblett Farms, Inc., stipulated in the sale of the land to Broussard that 2/32nds of the royalty would be charged against the one-half mineral rights reserved by it in the sale and that the 1/24th royalty interest previously sold was to be included in the 2/32nds royalty interest charged against the reserved mineral interest, it did nothing more than attach a real obligation (a portion of the reserved royalty interest) against the immovable property (the mineral servitude) reserved by it in the sale. Such an agreement is clearly authorized by LSA-C.C. Arts. 2010, 2012, 2013, and we cannot see how it can be said to contravene the public policy of the state or be a violation of good morals.
The 1/24th royalty interest, being a real obligation subject to the prescription of ten years, this prescription has "* * * the effect of releasing the owner of an estate from every species of real rights, to which the property may have been subject, if the person in possession of the right has not exercised it during the time required by law." LSA-C.C. Art. 3529; Vincent v. Bullock, supra. Consequently, when the 1/24th royalty interest was extinguished by the lapse of ten years without any production from the land, it did not revert to anyone. It merely ceased to be a burden or charge against the immovable property to which it had been attached, namely, the mineral servitude reserved by Niblett Farms, Inc.
It is argued that by the use of the terms "reversion" and "reversionary interest" in the act of sale of May 11, 1948, in that the 1/24th royalty would revert to the vendor when extinguished by prescription, was an effort to deal with a reversionary interest contrary to the public policy of the state as established in the case of Hicks v. Clark, 225 La. 133, 72 So.2d 322.
The rule in the Hicks case, to the effect that the reservation of a reversionary interest contrary to public policy will not be recognized, was significantly adopted for the sole purpose of preventing land from being burdened with a mineral servitude for a longer period than ten years without user. This rule reiterates the public policy of the state that the right to explore for oil, gas and other minerals reverts to the hand in the absence of use after the lapse of ten years.
In the instant case, immediately prior to Broussard's acquisition on May 11, 1948, the only obligation bearing against the land was the outstanding 1/24th mineral royalty interest. As a result of the reservations mutually agreed upon in Broussard's acquisition there then came into existence new obligations, namely the mineral servitude (½ of the minerals) and a 3/32nds mineral royalty interest reserved by vendor, Niblett Farms, Inc. It was expressly agreed and stipulated between the contracting parties that the obligations created arising out of the 1/24th mineral royalty interest would be assumed by vendor and paid out of its 1/24nds mineral royalty interest. This 3/32 royalty interest therefore became an obligation on the part of the vendor to be discharged out of the 3/32nds royalty interest. Consequently, when the 1/24th royalty interest, being a real obligation affecting the vendor's 3/32nd royalty interest, was extinguished by the prescription of ten years, the vendor's 3/32nds royalty reservation was released from and relieved of the obligation, thereby *107 entitling the vendor to the enjoyment of his full 3/32nds reserved royalty interest and which would necessarily include the value of the production formerly attributable to the 1/24th royalty interest.
The remaining question is whether the acts of acknowledgment executed by the Hawthorne interests on December 8, 1952 (superseded by an act of January 16, 1953), constituted an interruption of prescription running against that part of the 1/24th royalty interest then owned by David C. Ritchie and Mrs. Gladys R. Burchenal, and now claimed by J. Woodrow Waggoner and Hugh A. Hawthorne.
On December 8, 1952, Harry E. Hawthorne and Hawthorne, Inc. (successors of Niblett Farms, Inc.) executed an authentic notarial instrument, and superseded by a like instrument of date January 16, 1953, wherein they expressly recognized the acquisition by David C. Ritchie and Gladys R. Burchenal with others from Niblett Farms, Inc., of a 1/24th mineral royalty interest, of date January 10, 1943, each of the two purchasers having acquired a 1/144 interest or an aggregate of 1/72nd royalty interest. Hawthorne therein declared that he did by that instrument interrupt the prescription and reactivate the existing royalty interest in favor of the therein named royalty owners, and grants to both a full and reactivated ownership for the "longest period allowable by Louisiana Law." These are the stipulations relied on by the parties for the interruption of prescription.
Article 3520, LSA-C.C., stated that: "Prescription ceases * * * to run whenever the debtor, or possessor, makes acknowledgment of the right of the person whose title they prescribed * * *".
In the case of Goldsmith v. McCoy, 190 La. 320, 182 So. 519, 522, quoted with approval in Vincent v. Bullock, supra, we said:
"But article 3520 of the Code * * * does not mean that a mere acknowledgment of the existence of the rights of those in whose favor the servitude runs interrupts prescription. There must be more than a bare acknowledgment; the acknowledgment must be accompanied by or coupled with `the purpose and intention of the party making the acknowledgment to interrupt the prescription then running.'"

A reading of the deed relied on shows that at that time, namely December 8, 1952, there were royalty interests outstanding which, if and when oil or other minerals were produced, were to be paid and accounted for out of the mineral servitude reserved by Niblett Farms, Inc. In this situation the mineral servitude so reserved and subsequently acquired by the Hawthorne interest was a debtor and Ritchie and Burchenal to the extent of a 1/144th royalty interest each were creditors, entitled to the amount attributable to their designated interests in the 1/24th royalty interest.
We necessarily conclude that the instrument relied on was not a bare acknowledgment. The language contained in the instrument, clearly and expressly acknowledged the existence of the real obligation, granting to the then owners, now claimed by Waggoner and Hugh A. Hawthorne, a renewal and full reactivation of their ownership, prior to accrual of prescription, so as to constitute an interruption and renewal of the prescription allowable to real obligations under our law.
The contention that these acts of acknowledgment did not interrupt prescription, the landowner not having participated in their execution, does not impress us. As previously pointed out, the 1/24th royalty interest was an obligation to be discharged out of the 3/32nds royalty interest reserved by Niblett Farms, Inc. Until this 1/24th royalty interest had become extinguished by virtue of non-production during a period of ten years, we necessarily concede, as aforestated, that this royalty interest was a burden upon the land, though the obligation *108 to be discharged as aforestated. The agreement of the parties with respect to the 1/24th royalty interest did not extend the life of vendor's mineral servitude or reserved royalty interest beyond the normal ten-year period allowed it under our law, however, when the 1/24th royalty interest expired as a result of non-production within the ten-year period from date of its creation Broussard's land became free of the burden affecting it. The obligation of paying the 1/24th royalty interest being that of Niblett Farms, Inc., when this obligation ceased to exist the obligor, Niblett Farms, Inc., or its assignees, were free to extend the payment thereof at any time prior to its expiration by a formal act of interruption of prescription and the signature or the consent and participation of the landowner was unnecessary. Broussard's only concern was that after the lapse of ten years his land would be free of the said outstanding royalty interest. Niblett Farms, Inc., or its assignees, being the debtor upon whom rested the obligation, were the only parties necessary to make the acknowledgment constituting an interruption of prescription in the manner required by law. LSA-C.C. Art. 3520.
For the reasons assigned, the judgment of the trial court is reversed and set aside.
It is now ordered, adjudged and decreed that Harry E. Hawthorne, Hugh A. Hawthorne, and J. Woodrow Waggoner be and they are hereby declared to be the owners of. the 1/24th royalty interest herein in the proportions of 2/3rds, or 1/36th royalty interest, to Harry E. Hawthorne; 1/36th, or 44th royalty interest, to Hugh A. Hawthorne; and 1/6th or 1/144th royalty interest, to J. Woodrow Waggoner.
It is further ordered that the Clerk of Court turn over to the aforementioned owners in the above proportions the $5,532.51 deposited in the registry of the court, which amount represents the value attributable to the 1/24th royalty interest as of April 20, 1955.
It is further ordered that Union Oil & Gas Corporation of Louisiana, holder of the mineral leases on the lands involved herein, subject to the mineral royalty interests involved in this concursus, be and it is hereby relieved of all liability for the payment of the money deposited in this concursus and for all costs of these proceedings.
All costs are to be assessed in accordance with the provisions of Act 123 of 1922, as amended, LSA-R.S. 13:4816.
HAMITER, Justice (concurring in part and dissenting in part).
In my opinion the proceeds deposited in the registry of the court in this concursus proceeding (representing one-third of the one-eighth royalty which the lessee was obligated to pay under the terms of its lease) should be paid in the proportions of onehalf to Wallace J. Broussard and one-half to the Hawthorne group (Harry E. Hawthorne, Hugh A. Hawthorne and J. Woodrow Waggoner).
Except as to the reactivated royalty interests (those held by Hugh A. Hawthorne and J. Woodrow Waggoner and which affect only the mineral rights of Harry A. Hawthorne because he reactivated them without the approval of Broussard), the disputed one-twenty-fourth mineral royalty, admittedly, prescribed on January 19, 1953 as the result of nonproduction for ten years. On that date, in other words, it was extinguished; it ceased to exist; it was without any effect whatsoever. To use the language contained in Arkansas Fuel Oil Company v. Sanders, 224 La. 448, 69 So.2d 745, at that time it passed out of the picture; there was nothing to revert to anyone; the parties were in the same position as though no royalty right had ever existed. Consequently, then the respective one-half mineral rights of Wallace J. Broussard and Harry A. Hawthorne (except insofar as the reactivated interests are concerned) were free of the previously encumbering one-twenty-fourth royalty and *109 each of those persons became entitled to receive payment for any subsequent oil and gas production on the basis of his full mentioned mineral ownership.
True, the deed from Niblett Farms, Inc., to Broussard contained the recital that the disputed one-twenty-fourth royalty was to be paid out of two-thirds of Hawthorne's minerals and one-third of Broussard's minerals. But that recital contemplated the obtaining of production while such royalty was in existence. Hence, when the royalty "passed out of the picture" (because of failure of production during the ten year period) before any oil or gas was produced the mentioned obligations of Broussard and Hawthorne to pay in the stated proportions became ineffective. To conclude otherwise, I think, is to adopt the principle that contracts respecting reversionary rights are valida principle that we, on several occasions in our jurisprudence, have emphatically denounced as being contrary to public policy.

On Rehearing
TATE, Justice (dissenting).
The unanimous decision of this Court following the initial hearing correctly, in my opinion, disposes of the issues of this lawsuit. I therefore respectfully dissent.
The central question of this appeal concerns a land-vendor's power to reserve the right, after he sells the land, to receive the reversion of an outstanding mineral royalty interest previously created by him.
Although this precise question has never been presented, this Court has decisively and repeatedly held that a land-vendor may not reserve or deal with the reversionary rights to an outstanding mineral interest itself[1] (as distinguished from an outstanding mineral royalty interest.[2] Hicks v. Clark, 225 La. 133, 72 So.2d 322. As we stated in Liberty Farms v. Miller, 216 La. 1023, 1033, 45 So.2d 610, 614: "One may not reserve reversionary rights to minerals when he is not the owner of the minerals at the time the reservation is made. It is settled that, in such instances, the reservation is ineffective and the outstanding mineral interests revert to the person owning the land at the time prescription accrues. McDonald v. Richard, 203 La. 155, 13 So.2d 712; Gulf Refining Co. v. Orr, 207 La. 915, 22 So.2d 269, and Long Bell Petroleum Co. v. Tritico (on rehearing), 216 La. 426, 43 So.2d 782." See also Long-Bell Lumber Co. v. Granger, 222 La. 670, 63 So.2d 420, McMurrey v. Grey, 216 La. 904, 45 So.2d 73.
The majority opinion on rehearing accepts the reservor's argument that the owner is to be accorded full freedom of contract with regard to the present reversionary interest affecting minerals. This argument was specifically disapproved in Hicks v. Clark, 225 La. 133, 72 So.2d 322, 325, which pointed out that the landowner's liberty of contract with regard to mineral servitudes is subject to the proviso that no servitude contrary to public policy could be created. This leading decision flatly stated, after reviewing the mineral jurisprudence, 72 So.2d 325: "We *110 consider the reservation of the reversionary [mineral] interests in this case as an effort to circumvent the public policy of this state."
Although as pointed out by the majority a mineral royalty interest is another variety of a real right than is a mineral servitude, either real right "is susceptible of all the modifications that the will of the parties can suggest, except such as are forbidden by law." LSA-C.C. Art. 2013. (Italics mine.) With regard to whether it is or is not against the public policy of this State to permit reservation of reversionary interests, I can see no adequate legal basis for differentiating between the mineral royalty interest and the mineral servitude. Both result from the creation of "real obligations", which are simply defined as "obligations, attached to immovable property." LSA-C.C. Art. 2010. Whether the real right in question is a right to go upon and explore the land for minerals, or whether it is a conditional right to receive the proceeds of mineral development, is immaterial for purposes of deciding whether the landowner may or may not reserve the reversionary interests affecting minerals.
The distinction sought to be made, namely that the mineral royalty right upon its extinguishment by prescription did not revert to anyone but merely ceased to be a charge against the immovable property, overlooks in my opinion that a mineral servitude is no less a "charge" against the land (i. e., a real obligation attached to immovable property). To say that one sort of mineral interest merely "ceased to be a charge against the land", while the other "reverts" to someone, is merely a different method of verbal characterization, not distinguished by any difference in legal effects. In both cases, the land is no longer charged with the real obligation, as a result of which some land or mineral owner benefits; which, it is the task of this court to decide.
If it is against the public mineral policy of this State for the landowner who does not own the mineral servitude (i. e., the right to go upon the land to explore for minerals) to attempt to secure the reversion thereof to himself upon the expiration of the outstanding mineral servitude, I cannot see why it is not equally against Louisiana's public policy for the landowner who does not own the mineral royalty right (i. e., the right to receive a share of the mineral production if such production occurs within the prescriptive period) to attempt to secure the reversion thereof to himself. There is just no fundamental distinction in this regard between these two types of interests relating to minerals.
Continental Oil Co. v. Landry, 215 La. 518, 41 So.2d 73, involved a similar attempt to distinguish, for purposes of prescription, a mineral royalty from a mineral interest. The mineral royalty deed covered several non-continguous tracts of land, and the royalty owner claimed that production within the prescriptive period on one of the tracts had interrupted prescription by user and preserved his mineral royalty right as affecting also the non-contiguous tracts upon which production had not occurred within the prescriptive period. This Court, pointing out that user within the ten years of a mineral servitude did not maintain the servitude as to other non-contiguous tracts likewise subject thereto, stated that "To hold that production on these lots prevented the running of such prescription where a royalty right is involved is, in effect, holding a royalty right to be greater than, or superior to, a mineral right, and this, as we have pointed out hereinabove,[3] is not so," 41 So.2d 76. We are in this case applying a different *111 and more favorable rule to the landvendor with regard to his dealing in previously-created mineral royalty interests than we ever have with regard to his dealing in previously-created mineral interests; we should well take heed of the warning in the Landry case that "such a holding might well serve as basis of numerous methods of circumvention of that policy" [i. e., "the land policy of this state"], 41 So.2d 76.
In the present case, if there had been an outstanding 1/244th mineral interest as well as an outstanding 1/24th mineral royalty interest, the landowner's attempt when he sold the property to reserve the former would under our settled jurisprudence have been ineffective, although we are now upholding his attempt to reserve the latter. As suggested by the Landry case, if it is indeed against the public policy of this State to permit a landowner to deal with reversionary mineral interests, then to permit him to deal in the reversionary rights to mineral royalty interests (concerning the right to receive the proceeds from the exercise of the mineral interest (offers an easy method to circumvent such public policy.
For the reasons so stated, I respectfully dissent, in the belief that the original opinion of this court should be reinstated.

On Second Rehearing
HAWTHORNE, Justice.
Pursuant to R.S. 13:4811 et seq., Union Oil & Gas Corporation of Louisiana instituted this concursus proceeding to determine the disposition of the funds accruing to a disputed 1/24 royalty interest on oil and gas produced from a well completed by petitioner on or about January 11, 1955. The well was drilled under mineral leases owned by petitioner on lands in Jefferson Davis Parish, Louisiana, including the NE¼ of Section 33, Township 10 South, Range 4 West.[1] The claimants are Wallace J. Broussard on the one part and Harry E. Hawthorne, Hugh A. Hawthorne, Harry R. Hawthorne, and J. Woodrow Waggoner on the other part, hereafter designated as the Hawthorne group.[2]
The pertinent facts necessary for this opinion are these:
On January 19, 1943, Niblett Farms, Inc., the owner of a large tract of land together with all the minerals, conveyed a 1/24 royalty interest to various persons in varying proportions. On May 11, 1948, Niblett Farms sold the property to claimant Wallace J. Broussard by act which contains the following provisions:
"(a) There is excepted from this conveyance oil, gas and other mineral royalties and royalty rights heretofore reserved and sold to others and hereby especially reserved to the vendor in the total of 3/32nds of all of the oil, gas and other minerals produced or to be produced and saved from the land; provided, however, that the foregoing 3/32nds royalty interest includes as a part thereof a royalty interest of 1/24th of the oil and gas on and under said land and to be produced therefrom, being the same 1/24th interest heretofore sold to Mrs. Sarah L. Martin, David C. Ritchie, Mrs. Gladys C. [G.] Burchenal, Charles A. McCoy and Mrs. Gertie Holloway [Hallowell], by deed dated January 19, 1943, and recorded on page 29, Book 98 of the Records of the Parish of Jefferson Davis, State of Louisiana, the rights of Grantor under this additional reservation being subject to the prior sale so made, but including all reversionary rights of grantor as the present owner of said land, it being the intention that if and when *112 the 1/24th royalty rights so sold should terminate, the reversion thereof shall be for the benefit of grantor herein whose rights to such additional amount of royalties shall immediately become effective. [Italics ours.]
"(b) Vendor herein reserves for itself and its successors and assigns a mineral right interest in the said land, together with all necessary rights of ingress and egress thereon, equal to one-half (½) of the oil, gas and other minerals therein and thereunder, but subject to the limitations and conditions hereinafter stipulated.
"(c)Two-thirds (2/3) of the amount of outstanding royalties hereinabove excepted from this conveyance, or a total of 2/32nds of all of the oil, gas and other minerals produced from said land shall be chargeable against and payable out of the mineral right interest herein reserved to and by vendor; the remaining 2/32nd royalty interest being chargeable to and deducted from the rights of the vendee in the land herein described.
"(d) No lease shall be granted unless such lease provides for sufficient royalties payable out of the oil, gas and other minerals produced from the land to pay all royalties outstanding on the date of this deed and which are to be charged against the respective rights of the parties as set forth in paragraph (c) hereof, and so as to pay vendee herein, or his successors and assigns, a minimum royalty of 1/32 of all the oil, gas and other minerals produced and saved from the property. Should any lease to be negotiated in the future provide for total royalties in excess of the usual 1/8th, then the amount of royalties in excess thereof shall then be divided between and belong to vendor and vendee, or their respective successors or assigns, in equal proportions."
It is to be noted that under this conveyance Niblett Farms reserved ½ of the minerals, conveying to Broussard the other ½ together with all the lands.
In September, 1948, Niblett Farms sold to Harry E. Hawthorne the ½ of the minerals which it had reserved.[3]
In 1949 and 1950 Wallace J. Broussard and Harry E. Hawthorne executed oil and gas leases covering the property which provide for a royalty to be paid to the lessors of 1/8 the oil and gas produced from the premises. Union as the owner of these leases drilled a well in the NE ¼ of Section 33, Township 10 South, Range 4 West, Jefferson Davis Parish, Louisiana, which was completed as a producer of oil and gas condensate in paying quantities on or about January 11, 1955.
Let us now return to the 1/24 royalty interest sold by Niblett Farms on January 19, 1943, to the following persons in the following proportions:

 Mrs. Sarah L. Martin 1/72
 David C. Ritchie 1/144
 Mrs. Gladys G. Burchenal 1/144
 Charles A. McCoy 9/720
 Mrs. Gertie Hallowell 1/720

It is conceded by all claimants that 10 years elapsed without production after the creation of the 1/24 royalty interest. At the end of this period, that is, on January 19, 1953, the land was owned by Wallace J. Broussard, and the minerals were owned as follows:

 Wallace J. Broussard 1/2
 Harry E. Hawthorne 9/32
 Hugh A. Hawthorne 5/32
 Harry R. Hawthorne 2/32

The three Hawthornes as successors to Niblett Farms owned the ½ mineral interest reserved by Niblett in its sale to Broussard.
*113 In other words, on January 19, 1953, Broussard was the owner of the land and ½ of the minerals, and the three Hawthornes, in the proportions shown above, were the owners of the other ½ of the minerals.
On January 16, 1953, Harry E. Hawthorne, at that time the owner of 9/32 of the minerals, executed an instrument declaring that he reactivated those portions of the 1/24 royalty sold to David C. Ritchie and Mrs. Gladys G. Burchenal (an undivided 1/24 each). Subsequently Ritchie and Mrs. Burchenal conveyed this 1/72 royalty interest to J. Woodrow Waggoner, and Waggoner on May 8, 1953, conveyed one-half of it, or 1/144 royalty, to Hugh A. Hawthorne. In other words, this 1/72 royalty is now claimed by Hugh A. Hawthorne and J. Woodrow Waggoner in the proportion of 1/144 to each.
The trial judge found that under the instrument of May 11, 1948, Broussard was entitled to 1/3 of the outstanding 1/24 royalty and the Hawthorne group to 2/3 He recognized also that under the instrument of January 16, 1953, the share of Harry E. Hawthorne was chargeable with the 1/72 royalty interest which Hawthorne had recognized or reactivated. As a result he concluded that the 1/24 royalty was owned as follows:

 Wallace J. Broussard 1/72 royalty
 Harry E. Hawthorne 1/576 royalty
 Hugh A. Hawthorne 9/576 royalty
 Harry R. Hawthorne 1/288 royalty
 J. Woodrow Waggoner 1/144 royalty

Accordingly the judge ordered the sum deposited by Union to be paid in the following proportions:
To Broussard 16/48, or 1/3 of the whole; To the Hawthorne group 2/3 of the whole, as follows:

 Harry E. Hawthorne 2/48
 Hugh A. Hawthorne 18/48
 Harry R. Hawthorne 4/48
 J. Woodrow Waggoner 7/48.[4]
All claimants with the exception of Waggoner perfected suspensive appeals to this court.
Broadly speaking, the primary contentions of these claimants are as follows: Broussard contends that when the 1/24 royalty prescribed or terminated, he as owner of the land became entitled to the 1/24 of production of oil and gas. The other claimants, the Hawthorne group, take the position that the 1/24 royalty interest was a charge on the ½ mineral interest reserved by Niblett Farms, and that consequently when it prescribed or ceased to exist, they as successors of Niblett are entitled to the 1/24 of production of oil and gas. Thus Broussard claims the entire fund deposited in the court, and so does the Hawthorne group.
As stated in the leading case of Vincent v. Bullock, 192 La. 1, 187 So. 35, a mineral royalty interest is not a servitude, but is a species of real right which entitles the owner to participate in production when and if production is obtained, and is subject to the prescription of 10 years liberandi causa. Such a right is a conditional obligation depending on an uncertain event and prescribes in 10 years in the event production of the minerals does not occur within that period of time. See St. Martin Land Co. v. Pinckney, 212 La. 605, 33 So.2d 169.
It has been recognized and stated by this court that a royalty right is but an appendage of a mineral right, and that a mineral right due to its nature is necessarily superior to a royalty right. In Continental Oil Co. v. Landry, 215 La. 518, 41 So.2d 73, 75, we said:
"* * * of these two rights it has been correctly said by one of the authorities on the oil and gas law of this state that the royalty right is but an appendage of the right of the mineral owner, and depends upon the continued existence of the right to which it is an appendage. It cannot have a life of its own, any more than could interest exist apart from the note or *114 debt to which it is attached. See Daggett, Mineral Rights in Louisiana (1939), p. 173." See also Vincent v. Bullock, supra.
In Arkansas Fuel Oil Co. v. Sanders, 224 La. 448, 69 So.2d 745, 746, this court stated:
"When the royalty right prescribed it passed out of the picture. There was nothing to revert to anyone. The parties are in the same position as though no royalty right had ever existed. It was merely a conditional obligation depending on an uncertain event which prescribed in ten years because the event did not occur. Vincent v. Bullock, 192 La. 1, 187 So. 35; St. Martin Land Co. v. Pinckney, 212 La. 605, 33 So.2d 169; Continental Oil Co. v. Landry, 215 La. 518, 41 So. 2d 73; Union Sulphur Co. v. Lognion, 212 La. 632, 33 So.2d 178; Humble Oil & Refining Co. v. Guillory, 212 La. 646, 33 So.2d 182; Union Sulphur Co., Inc. v. Andrau, 217 La. 662, 47 So. 2d 38."
At this point we might state that in this case we refuse to give any force and effect to that provision found in Paragraph (a) of the instrument of May 11, 1948, in which Niblett sold the property to Broussard, stipulating that when the 1/24 royalty previously sold should terminate, its reversion was for the benefit of the grantor. In other words, in this instrument the vendor was reserving to itself a reversionary right of a royalty previously sold so that when the royalty right prescribed, it would inure to the benefit of the grantor. We think that to recognize and give effect to such a reservation would be contrary to the public policy of this state. In Hicks v. Clark, 225 La. 133, 72 So.2d 322, we refused to recognize and give effect to the reservation of a reversionary interest of a mineral right. A royalty right is but an appendage to a mineral right and cannot have a life of its own, and a mineral right is by its nature superior to a royalty right. If the reservation of a reversionary interest in the superior right is contrary to the public policy of this state, it follows that the reservation of the reversion of the inferior right is likewise contrary to public policy. Moreover, under the jurisprudence of this court, when a royalty prescribes, it ceases to exist, and there is nothing to revert. Arkansas Fuel Oil Co. v. Sanders, supra.
At the time the 1/24 royalty sale was made, the vendor Niblett owned all the minerals, and accordingly this royalty right was an appendage of all the minerals and was a charge on all the minerals for the payment of the proceeds of the royalty in the event of production of oil and gas before prescription accrued; it was not a charge on a fractional or pro-rata part of the minerals.
At the time this 1/24 royalty prescribed, the minerals were owned as follows:

 Broussard ½
 Harry E. Hawthorne 9/32
 Hugh A. Hawthorne 5/32
 Harry R. Hawthorne 2/32

After 10 years with no production, prescription accrued, and this royalty ceased to exist, or, as said in Arkansas Fuel Oil Co. v. Sanders, supra, "it passed out of the picture. There was nothing to revert". Consequently all the minerals to which this royalty was an appendate were relieved of its charge, and therefore, due to the ownership of the minerals at that time, Broussand's ½ of the minerals was relieved of ½ of this charge to the extent of 1/48 or 16/768, royalty, and the other ½ of the minerals, which belonged to the three Hawthornes, was likewise relieved of ½ of this charge. Hence when the 1/24 royalty prescribed or ceased to exist, the various mineral interests were relieved of its charge as follows:

 Mineral Interest Royalty
 ½ Broussard 1/48 or 16/768
 9/32 Harry E. Hawthorne 9/768
 5/32 Hugh A. Hawthorne 5/768
 2/32 Harry R. Hawthorne 2/768
 _______ ___________
 82/32 32/768 or 1/24

*115 Now let us again consider the contract of May 11, 1948, by which Niblett Farms conveyed the property to Broussard and which contains the provisions designated (a), (b), (c), and (d), quoted above.
We recognize the principle of law that the plain intention of the parties to a contract not contrary to public policy or prohibitory law is to be given full force and effect. When Niblett sold the property to Broussard, it was perfectly legal for the vendor to provide that the 1/24 royalty was a part of, and included in, the 3/32 royalty reserved by it, and this shows that it was the plain intention as between Niblett and Broussard that in the event production was had before the accrual of prescription, the 1/24 royalty was to be deducted from Niblett's 3/32 royalty, or that the proceeds inuring to this 1/24 royalty would be paid to the royalty owners and that Niblett would receive a 3/32 royalty less the 1/24, or a net 5/96 royalty.
The provision of the contract as to how the 1/24 royalty was to be charged was in no way binding upon the owners of the 1/24 royalty as they were not parties to this contract. For the payment of this royalty in the event of production prior to the accrual of prescription these royalty owners had the right to have their royalty interest satisfied from all the minerals and not from a fractional part, for their royalty interest was a charge on all the minerals.
It is equally clear under this contract that if production was obtained prior to the accrual of prescription as to the 1/24 royalty, Broussard under leases providing for a total royalty of 1/8 to lessors was to receive a royalty interest of 1/32 and no more. Thus under the plain provisions of the contract, in the event production had been obtained within 10 years, the 1/8 royalty including the 1/24 would have been payable as follows:

 Royalty
 Niblett 3/32 minus 1/24 = 5/96 net royalty
 Broussard 1/32 or 3/96 net royalty
1/24 royalty owners 1/24 or 4/96 net royalty
 _________
 12/96 or 1/8

The next question, then, is how the 1/8 royalty provided for in the leases is to be divided between the parties to this contract in the event no production was had within 10 years and the 1/24 royalty sold by Niblett prescribed.
The instrument of May 11, 1948, provides that Niblett reserved unto itself a 3/32 royalty, but the very language of the instrument clearly shows that the disputed 1/24 royalty is included in the 3/32 royalty reserved to Niblett. The instrument says:
"* * * the foregoing 3/32nds royalty interest includes as a part thereof a royalty interest of 1/24th of the oil and gas on and under said land and to be produced therefrom, being the same 1/24th interest heretofore sold to Mrs. Sarah L. Martin, David C. Ritchie, Mrs. Gladys C. [G.] Burchenal, Charles A. McCoy and Mrs. Gertie Holloway [Hallowell] * * *."
In the event of production prior to the accrual of prescription Niblett could recover only a 3/32 royalty minus a 1/24 royalty, or a net 5/96 royalty, as stated above. For Niblett to receive a full 3/32 royalty after prescription accrued would require a recognition of a reversionary right in Niblett to the disputed 1/24 royalty which was included in the 3/32 royalty reservation. This would be contrary to the public policy of this state and also contrary to the law as established by the jurisprudence of this court that when prescription accrues, the royalty passes out of existence. Consequently this provision as well as any other provision of the contract reserving unto Niblett a full 3/32 royalty is ineffective, and Niblett under the contract is entitled, after the accrual of prescription as to the 1/24 royalty, to recover a net 5/96 royalty and no more. Stated somewhat differently, for Niblett to receive a full 3/32 royalty would require us to hold that when the 1/24 royalty prescribed due to non-production, it reverted to Niblett or Niblett's successors by provisions of the contract. This we will not do.
*116 From a lease providing for a 1/8 royalty to lessors, Broussard under the contract was to receive a 1/32 royalty and no more. At the time prescription accrued as to the 1/24 royalty he was the owner of ½ of the minerals. Consequently when the 1/24 royalty prescribed or ceased to exist, his mineral interest was relieved of ½ of the burden or charge of this 1/24 royalty, and hence from the leases which provided for a 1/8 royalty he is entitled to a 5/96 (1/32 plus 1/48) royalty. From such a lease, under the provisions of the contract Niblett can receive, as already pointed out, only a net 5/96 royalty. When the 1/24 royalty prescribed or ceased to exist, the ½ mineral interest of Niblett or its successors was relieved of ½ of the burden or charge of this 1/24 royalty, and consequently from the leases which provided for a 1/48 royalty they are entitled to a 7/96 (5/96 plus 1/48) royalty. For clarity, when prescription accrued as to the 1/24 royalty, the 1/8 royalty provided for in the leases became payable to Niblett (or its successors) and Broussard, each owning ½ of the minerals, as follows:

 Niblett (or its 1/48 royalty plus 5/96 royalty
 successors) under contract = 7/96
 Broussard 1/48 royalty plus 1/32 royalty
 under contract = 5/96
 _______
 12/96 or
 1/8

Let us now consider the instrument executed on January 16, 1953, by Harry E. Hawthorne, who at the time was the owner of 9/32 of the minerals and who declared in the instrument that he reactivated 2/144, or 1/72. of the 1/24 royalty, which is now claimed ½ each by J. Woodrow Waggoner and Hugh A. Hawthorne. The trial judge correctly analyzed the effect of this so-called reactivation and concluded:
"We must next consider the effect of the attempt by Harry E. Hawthorne to interrupt prescription as to the one/ seventy-second (1/72) royalty owned by Mr. Ritchie and Mrs. Burchenal. Harry E. Hawthorne himself contends that his instrument of January 16, 1953 (U-24) extended the royalty to Mr. Ritchie and Mrs. Burchenal. Since he was as of that date, the record holder of a nine/thirty-second (9/32) mineral interest he had a sufficient mineral interest to permit his interruption of that royalty. Since he is the only party giving up something of value and since he himself contends that the interruption was valid, the court recognizes that said one/seventy-second (1/72) was interrupted and will recognize the acts transferring title to Hugh A. Hawthorne to the extent of a one/one-forty-fourth (1/144) and J. Woodrow Waggoner to the extent of a one/one-forty-fourth (1/144). Of course, this one/ seventy-second (1/72) which Harry E. Hawthorne interrupted must be charged to his mineral interest."
Finally let us discuss Broussard's contention that because of his ownership of the land he is entitled to the entire proceeds inuring to the 1/24 royalty deposited in the registry of the court.
As we have pointed out, it is well settled under the jurisprudence of this court that a royalty right is an appendage to a mineral right and cannot have any life of its own, and that when a royalty right prescribes, it ceases to exist, and the parties are in the same position as though no royalty right had ever existed. Under these principles of law how can it be argued that when a royalty right prescribes or ceases to exist, it inures to the benefit of the owner of the land simply because of such ownership even though the landowner may own no mineral interest whatever?
For example, A, the owner of the land and the minerals, sells all the minerals to B. One year later B, the owner of all the minerals, sells a 1/6 royalty to C. After the mineral servitude created by A's sale to B of all the minerals has been in existence some eight years, a bona fide drilling operation is conducted which results in a dry hole. Of course this drilling operation would interrupt prescription as to the mineral servitude, which would continue in existence for another 10 years. However, *117 upon the expiration of 10 years from the royalty sale without production, even though the mineral servitude was still in existence, could it be said that the 1/16 royalty came back to the land and inured to the benefit of the landowner even though the landowner owned no minerals? If this were true, all the minerals would be owned by B, and A, the landowner, would own a 1/16 royalty. How could this be if a royalty right is but an appendage of a mineral right, depends upon the continued existence of the right to which it is an appendage, and ceases to exist when prescription accrues? If it ceases to exist, it does not inure to the benefit of anyone; all that happens is that the mineral interest to which it is an appendage is relieved of its charge.
Let us illustrate by another example. A, owner of the land and the minerals, sells a 1/16 royalty to B. Five years later A sells all the minerals to C. There is no production. Five years after the mineral sale the 1/16 royalty prescribes and ceases to exist. However, after the royalty prescribes but before the mineral servitude prescribes, production is had. Although C owns all the minerals at the time this production is obtained, would A, solely because of his ownership of the land, be entitled to a 1/16 royalty from the production? If the royalty has ceased to exist and the parties are in the same position as though no royalty has ever existed, can there be any conclusion other than that C, the owner of all the minerals, would receive all the royalty from production?
Therefore, under the jurisprudence it is patent that Broussard is not entitled to the entire proceeds of the 1/24 royalty by virtue of his ownership of the land.
For the reasons given above, we have concluded that the fund on deposit in the registry of the court should be divided in the following proportions:
 ½ to Broussard
 ½ to the Hawthorne group
 (including Waggoner).
Of the 1/8 royalty due to lessors under the leases, a 5/96 royalty should go to Broussard and a 7/96 royalty to the Hawthorne group (including Waggoner) as successors to Niblett.
There is no dispute as to the interest of the Hawthorne group among themselves; the only dispute is between Broussard on the one part and the Hawthorne group on the other. We think it to the best interest of all parties that we remand this case to the district court so that a proper decree can be rendered ordering a distribution of the funds in the registry of the court pursuant to the views expressed above and setting forth the proportionate share of each claimant. This decree must also take into consideration the fact that Harry E. Hawthorne's interest is to be charged with a 1/72 royalty, 1/144 of which is to be credited to Hugh A. Hawthorne and 1/144 to J. Woodrow Waggoner.
For the reasons assigned the judgment of the district court is reversed and set aside, and for the purpose given above the case is remanded to the district court for a distribution of the fund in the registry of the court in accordance with the views here expressed.
It is further ordered that the decree of the lower court relieve the Union Oil & Gas Company of Louisiana of all liability for the payment of the money deposited in this concursus and for all costs of these proceedings.
All costs are to be paid in accordance with R.S. 13:4816.
The right to apply for a rehearing is reserved to all appellants.
SIMON, J., adheres to original opinion on First Rehearing.
HAMITER, J., concurs adhering to his previously assigned reasons.
NOTES
[1] The mineral interest in a land created by reservation or deed "constitutes a servitude imposed upon the land, giving the owner thereof the right of ingress and egress for the purpose of exploring for and reducing to possession the minerals under the property so burdened." Horn v. Skelly Oil Co., 224 La. 709, 70 So.2d 657, 660.
[2] As we recently restated in description of the mineral royalty interest involved in Union Sulphur Co. v. Andrau, 217 La. 662, 606-070, 47 So.2d 38, 40, such an interest "imposed on the property a real obligation, since it was attached to an immovable, and passed with the property, conditioned upon the production of oil and gas or other minerals; but if such condition did not happen within ten years, such royalty interest was lost by the prescription of ten years"; "the right of the owner of such an interest `is restricted to a sharing in production if and when it is obtained by the landowner or a lessee.'"
[3] See 41 So.2d 75: "In the past this court has observed and stated that a mineral right is necessarily superior to a royalty right. * * * Of these two rights it has been correctly said by one of the authorities on the oil and gas law of this state that the royalty right is but an appendage of the right of the mineral owner, and depends upon the continued existence of the right to which it is an appendage."
[1] Petitioner deposited in the registry of the court $5,532.51 as the value of the royalty interest in dispute from date of first production to April 20, 1955.
[2] The writer of this opinion is not acquainted with any member of the Hawthorne group, nor is he to his knowledge related to them.
[3] In 1952 Hawthorne, Inc., the name to which the corporation Niblett Farms, Inc., was changed, conveyed to Harry E. Hawthorne "All of the right, title and interest which Hawthorne Inc. owns to the reversionary mineral and/or royalty rights" in and to, among other lands, the land upon which the producing well was drilled.
[4] See trial judge's reasons for judgment, quoted in both our original opinion and our opinion on first hearing.